[No. 15943. Department Two. November 30, 1920.]

NICK PELTOLA, *Respondent*, v. WESTERN WORKMAN'S
PUBLISHING SOCIETY, *Appellant*.[1]

PRINCIPAL AND AGENT (35-1)—RIGHTS AS TO THIRD PERSONS—
AUTHORITY OF AGENT—RECEIPT OF MONEY FOR DEPOSIT—EVIDENCE—
SUFFICIENCY. The manager of a branch Finnish store is shown to
have had authority to receive money on deposit for safe-keeping,
where the general manager testified that he was authorized to give
a temporary receipt for it and send it to the main office, which issued
a permanent receipt in the name of the company, whereupon the
money went into its bank account and customers of the store under-
stood that such deposits were part of its business.

BAILMENT (4)—CONVERSION BY BAILEE—COMMINGLING FUNDS—
LIABILITY. Where a bailee accepts money for safe-keeping and mixes
it with its own money in one banking account and it is lost, the
bailee is liable for a conversion, though the money was stolen or em-
bezzled by an employee or agent.

Appeal from a judgment of the superior court for
King county, Allen, J., entered January 19, 1920, upon
findings in favor of the plaintiff, in an action for
money had and received, tried to the court on the
merits. Affirmed.

*Meyers & Couden,* for appellant.

*James B. Murphy,* for respondent.

MOUNT, J.—This action was brought to recover
money alleged to have been deposited with the defend-
ant for safe-keeping. The defense was that the money
was not deposited with the defendant; that, if any
money was deposited, it was deposited with defend-
ant's manager personally and the defendant is not
liable. The case was tried to the court without a jury,
and resulted in a judgment in favor of the plaintiff
for $1,613.50. The defendant has appealed.

[1]Reported in 193 Pac. 691.

The facts may be briefly stated as follows: The defendant is a corporation organized under the laws of the state of Oregon, with its principal place of business in Astoria, Oregon. At its home office it published a daily newspaper in the Finnish language, called "The Toveri." Some time prior to March, 1917, it had established a branch of its main office in Seattle, where it did business. At this place of business, it conducted a large storeroom or hall, where it kept for sale a stock of books, newspapers, magazines, cigars, tobacco, pipes and articles usually kept in a cigar store. It also maintained a lunch counter, sold soft drinks, kept billiard and pool tables, card rooms, etc., for the trade which depended upon the Finnish people. This store was commonly called "The Toveri," or "Toveri Hall." At this place the appellant maintained a safe and two cash registers, which were used by employees who attended the store. All the corporate officers of the appellant were residents of Astoria, Oregon. The place of business in Seattle in this state was conducted by an official called a "branch manager," who was selected by the board of trustees to act as manager of the appellant's business at Seattle.

On the 1st of March, 1917, one F. E. Kangas was appointed to the position as branch manager and assumed the duties of handling the business in Seattle. He opened a checking account in a Seattle bank in the name of the appellant, but no one could check out funds from the bank except Mr. Kangas. The only way that funds could be drawn from the bank was by a check signed "Western Workman's Publishing Society, by F. E. Kangas." As a part of his duties, Mr. Kangas was required by the appellant to keep a cash book wherein was entered all of the receipts and

expenditures made in the ordinary course of business of the Seattle branch. He purchased all the goods used in the store, paid all the expenses from the receipts of the store, and at the end of each month would send his cash book to the Astoria offices to be audited. He also kept a ledger in which money which was left with him for safe-keeping was entered. It was his custom to receive deposits for safe-keeping by Finnish customers of the place, and when money was left with him it would not be put in the cash register, but would be put in the safe and from the safe taken to the bank for deposit. When money was deposited, he would issue an ordinary receipt therefor in his own name. When depositors desired to withdraw money, he would take money from the safe or from money which he had on hand and pay the amount demanded, and would endorse the same upon the back of the receipt which he had given for the deposit. He also made small loans without interest to customers. This ledger book was not sent to the Astoria offices to be audited. It the year 1919 it was discovered that Mr. Kangas was short in his accounts with the store, and on the 1st of March of that year he was discharged. Shortly thereafter this action was begun by the respondent upon several claims assigned to him by persons who had deposited money with Mr. Kangas, who it is claimed was the agent of the appellant to receive money.

The principal and controlling question in the case, as we read the record, is whether Mr. Kangas was the agent of the appellant authorized to receive money on deposit, or whether the deposits which were left with him were left with him personally. The trial court, after hearing the evidence, concluded that the money deposited with Mr. Kangas during the time he was manager of the store was left with him as agent of

the appellant, and not in his personal capacity.   The appellant vigorously argues that Mr. Kangas was not authorized by the appellant to receive money on deposit for safe-keeping, and also that when money was left with Mr. Kangas for safe-keeping it was left with him personally for that purpose, and that he alone is responsible for the money.   We shall notice these two contentions briefly.

Mr. Kangas testified as a witness for the respondent. He testified in substance that he was authorized to receive money; that the agents of the appellant company knew that he was receiving money on deposit, and that he did not take the money to be accounted for by him personally, but that he took the money as agent for the appellant; that the money so deposited with him was used in the business, and what was not used in the business was deposited in the bank and mixed with the funds belonging to the respondent. The persons who deposited the money and who had assigned their claims to the respondent also testified that, when they deposited the money, they intended to deposit it with the respondent company; that they had read advertisements in the newspaper published by appellant at Astoria to the effect that the company received money on deposit for safe-keeping, and for that reason made the deposits with Mr. Kangas, who was the agent here of the appellant.   The officers of the appellant company in Astoria denied that they received money at the Seattle branch office for safe-keeping or for deposit, and denied that they knew that Mr. Kangas was accepting money in their behalf for safe-keeping.

The general manager of the appellant admitted that an advertisement was carried in their paper, which

was circulated in Seattle and sold at the Toveri Hall, which, translated into English, is as follows:

Book Store, 116 Fourth Avenue South, Telephone Main 4367.

Copies on hand of all kinds of literature (that means socialist literature and other merchandise that would not exactly be merchandise, but other things people need), as well as tickets to Finland and vice versa by best lines—to Finland and return on the best lines—transfers—acts as agent on money loans and savings and so on. Every party comrade should do all of his business of such nature in their own store.

He also testified, as quoted in the abstract, as follows:

"The word 'deposit' as used there means deposits in our business in Astoria. The Seattle branch company take money to be sent to Astoria, but not for savings in Seattle. That is what the advertisement means, that he can take money and send it to Astoria, but he cannot take money and keep it in Seattle. We have that understanding with our members, that all deposits must go to Astoria and we give certificates on Astoria in Seattle for deposits."

"Our company sometimes took money for safe-keeping, but whatever the Seattle manager took for the business, he would send to Astoria. He had authority to take money to send to Astoria, but not to keep it here, and when he took the money he was authorized to give a temporary receipt for it and send the money to Astoria and get a permanent receipt. All receipts were made out in the name of the company. That is the custom of the company. Such money as was taken for safe-keeping was kept at the company's account in the bank at Astoria. Such money went into the general banking account of the company in Astoria."

So it is apparent from this testimony of the general manager that the appellant did receive money for safe-keeping, and we think it is also apparent that the customers of the store, who were Finlanders, understood from the advertisement that money could be deposited for safe-keeping in the Seattle branch, and that

the manager of the Seattle branch was authorized to take it and receipt therefor. It is true that the ledger in which these accounts were kept was headed "moneys left with F. E. Kangas" and "money paid out by F. E. Kangas"; and it is also true that receipts which were issued by Mr. Kangas for deposits left with him were signed by him personally; but, according to the testimony of the general manager at Astoria, when moneys were deposited in Seattle, temporary receipts were to be given therefor and permanent receipts were not given until the money was received in Astoria. But it is apparent from this evidence that the appellant was accustomed to receive money from its customers and that this was a part of the business. The fact that the ledger in which these deposits were entered by Mr. Kangas seemed to be a personal ledger, and the fact that receipts issued by him are personal receipts, are explained by the fact that moneys received in this way were first to be received upon temporary receipts. But this fact would not relieve the appellant from accounting for the money before a permanent receipt would issue. If it was the custom of the appellant to receive money on safe deposit, the patrons of the appellant had a right to assume that Mr. Kangas was agent for the purpose of receiving moneys, and that moneys left with him were moneys left with the appellant.

We are satisfied from the evidence of the general manager himself that Mr. Kangas was authorized to receive money on behalf of the appellant, and having so received it, the appellant is liable even though Mr. Kangas may never have accounted to appellant for money so received.

We are also of the opinion that the evidence shows that Mr. Kangas was the agent of the company in

receiving these deposits for safe-keeping. The trial court, therefore, properly found that Mr. Kangas was the agent of the appellant and was authorized to receive money in the way he did. And we are also satisfied that there is not sufficient proof to overcome the finding of the court to the effect that Mr. Kangas received these moneys for the company and not for himself personally.

The rule is elementary that, if a bailee accepts money and places it in a private safe mixed with his own money, or deposits it with his bankers upon his own private account, such treatment of the funds is a conversion and renders the bailee absolutely liable even though the money is stolen or embezzled without his fault. 6 Corpus Juris, 1116. Mr. Kangas testified the moneys he received upon these deposits were sometimes loaned to customers of the store for short periods of time, part of it was placed in the bank to the credit of the appellant and mixed, but all of it was mixed with other moneys that belonged to the appellant. The appellant, it appears, never examined the bank account which was kept in its name in a Seattle bank, never examined the ledger in which the accounts of depositors were kept, and never audited this ledger. But even under the testimony of the general manager of the appellant, who lived at Astoria, we think it was the duty of the appellant to examine all these accounts and books and to keep track of them, and to know what money was deposited in the Seattle branch; and that, if the money so deposited was lost, then, under the rule above stated, the appellant was clearly liable, even though the money was lost by embezzlement of its local branch manager.

Upon the points discussed, we are satisfied the trial court was right in its conclusion, and the judgment

must be affirmed. It is unnecessary to notice other points in the appellant's brief.

HOLCOMB, C. J., MITCHELL, MAIN, and TOLMAN, JJ., concur.